# United States District Court
### for the Northern District of Oklahoma

Case No. 26-cr-55-JDR

UNITED STATES OF AMERICA,

*Plaintiff*,

*versus*

PHILIPPE HERMAN ROULET,

*Defendant.*

## OPINION AND ORDER

Philippe Herman Roulet was asleep in a car when officers from the Bartlesville Police Department knocked on the car window, opened the door, and asked him to leave the vehicle. Mr. Roulet did so. In the two minutes that followed, the responding officers smelled burnt marijuana, observed that Mr. Roulet was sweaty, unsteady, and lethargic, and saw him place a torch lighter on top of the vehicle. During a subsequent search, the officers discovered a firearm underneath the passenger seat. Based on that discovery, Mr. Roulet, who is a convicted felon, was arrested and charged with violating 18 U.S.C. § 922(g)(1). Mr. Roulet has moved to suppress the evidence of the firearm obtained during the search, arguing that the search and subsequent seizure violated his Fourth Amendment rights. *See* Dkt. 22.[1] The Court denies the motion.

---

[1] All citations use CM/ECF pagination. Citations to video exhibits refer to the time elapsed on the videorecording, rather than the timestamp on the videoframe.

No. 26-cv-055

I

After reviewing the evidence offered by the parties in their respective briefs, the video footage provided by both parties, and the testimony presented by the Government, the Court finds the following facts: On January 23, 2026, Bartlesville police officers responded to a request for a welfare check for an individual slumped over in a car parked in a Tractor Supply Co. parking lot. The officers were informed that a store employee had tried to wake the individual by knocking on the window but was unable to do so. When the officers arrived at the parking lot, they found Mr. Roulet slumped over the steering wheel of a black car, which was running. The temperature that evening was below freezing.[2]

Officer Levi Johnson knocked on the car's window[3] and opened the door soon afterward. After he opened the door, Officer Johnson noticed the strong smell of burnt marijuana coming from the vehicle.[4] Officer Johnson

---

[2] Officer Johnson testified to the facts giving rise to the welfare call during an evidentiary hearing, as well as the fact that the temperature was approximately seventeen degrees Fahrenheit with a wind chill of negative one degree.

[3] Officer Johnson testified that he knocked on the window on two occasions. Only the second set of knocks is captured on video taken from the officers' body camera footage.

[4] Officer Johnson testified that he noticed the smell of burnt marijuana when he opened the car door. In their reports, both Officer Johnson and Officer Parrish reported that they could smell marijuana through the open door of the vehicle. Dkt. 31-1 at 13, 23. The Court credits this testimony, which is corroborated by statements recorded on the body camera footage, marijuana later found in the car, and Mr. Roulet's admission that he had been using marijuana. *See* Dkt. 23-3 at 0:50-1:05 (indicating that he assumed the smell of marijuana was part of the basis for the search); Dkt. 23-1 at 2:30-2:55. Mr. Roulet claims that Officer Johnson *denied* smelling marijuana at the scene of the arrest and that any suggestion to the contrary is a post hoc justification for an otherwise unlawful search. Dkt. 22 at 3 (citing Dkt. 23-3 at 1:07-11). The Court has reviewed the evidence and disagrees with Mr. Roulet's characterization. Officer Johnson did not deny that he was able to *smell* marijuana; he denied the suggestion that the smell of marijuana was the subjective basis (or perhaps the sole subjective basis) for the search of the car. *See* Dkt. 23-3 at 1:07-24 (responding that search was not based on the smell of marijuana and pointing to other evidence that led to the decision to search the vehicle). Based on the totality of the evidence, the Court finds

*(footnote continues)*

2

No. 26-cv-055

directed Mr. Roulet to step out of the car and place the items he was holding—one of which was a torch lighter—on top of the car. Mr. Roulet did so. Another officer instructed Mr. Roulet to step onto a nearby parking strip. Mr. Roulet complied, but he was unsteady on his feet, holding his arms out as he stepped over the concrete curb. Mr. Roulet then placed his hand on a nearby tree, turned around, and slid to a seated position with his back against the tree.

Once Mr. Roulet was seated (approximately thirty-five seconds after the second, recorded knock), Officer Johnson asked whether he had been smoking fentanyl. When Mr. Roulet denied doing so, Officer Johnson asked why there was a torch lighter "in [his] pocket" why he was "sweating [his] ass off." Dkt. 32-2 at 1:05-20.[5] Mr. Roulet responded, "Torch in my pocket?" The officers replied that he had placed a torch lighter, which had been on his lap, on the roof of the car. Mr. Roulet, in a much quieter voice, responded "sorry guys." *Id.* During the brief interval between Officer Johnson opening the door and Mr. Roulet responding, "sorry guys," Mr. Roulet appeared confused, disoriented, and unsteady on his feet. *Id.* at 0:35-1:20

Soon after pointing to the torch lighter on top of the vehicle with his flashlight, Officer Johnson stepped toward the car and shined his light into the driver's side cabin. Officer Johnson admitted in his testimony that his hand and flashlight crossed into the cabin of the car while he looked inside. Officer Johnson noticed bullets in the main compartment of the vehicle. *See* Dkt. 31-1 at 18; *id.* at 23 (stating that during a "quick look at the vehicle"

---

that the smell of marijuana was detectable when the car door was opened and credits Officer Johnson's testimony that he smelled of marijuana when the door was opened prior to the search.

[5] The video depicts a visible sheen on Mr. Roulet's forehead. During the encounter, Mr. Roulet denied that he was sweating, but in a later video he can be seen wiping his hand on his pants after wiping his forehead. Dkt. 23-2 at 1:50-2:00.

No. 26-cv-055

Officer Parrish observed "bullets of miscellaneous caliber").[6] Approximately five seconds later, Officer Johnson asked Mr. Roulet, "Hey, where's the gun at that goes to these bullets?" Dkt. 32-2 at 1:20-30. Officer Johnson continued looking into the car through the open driver-side door and the backseat window, at one point leaning his upper body through the open door. *See* Dkt. 23-1 at 1:30-2:00. Officer Hollenbeck walked to the passenger side of the car and used his flashlight to view the car's contents. He remarked to Officer Johnson, who had joined Officer Hollenbeck, that there were "lots of bullets" in the car. Dkt. 23-1 at 1:25-2:00. These bullets were visible through the closed windows of the vehicle. *Id.* Officer Johnson opened the passenger-side door, searched for the associated firearm, and found it under the passenger seat approximately two minutes later. *Id.* at 4:00-24.

## II

Mr. Roulet argues that the search leading to the discovery of the firearm was impermissible and that the evidence found during that search should be suppressed. When evaluating this argument, the Court must consider the encounter between Mr. Roulet and the Bartlesville police "in a step-by-step fashion, focusing on each stage of the encounter," as routine stops will often escalate into something more. *United States v. Richardson*, 69 F.3d 549, 1995 WL 623377, at *4 (10th Cir. 1995) (unpublished). The Court must ensure that "the requisite level of suspicion or cause is present at each stage of the encounter," however it develops. *Id.*

The Court begins with the initial forty-five seconds of the encounter. The Government and Mr. Roulet agree, and the Court finds, that the officers had a reasonable basis for knocking on the window of Mr. Roulet's car, opening the door, asking him to move away from the vehicle, and asking him

---

[6] It is not clear from the evidence or testimony whether Officer Johnson saw the bullets before his hand entered the vehicle, but it is clear from other portions of the body camera footage that the bullets were visible to officers without opening the car door or entering the vehicle. *See* Dkt. 23-1 at 1:35-2:00.

questions. The officers were responding to a request for a welfare check of a person slumped over in a vehicle parked in a store parking lot on a cold night. As even Mr. Roulet acknowledges, the officers were properly performing their community-caretaking roles during the initial forty-five seconds of their encounter with Mr. Roulet. Dkt. 22 at 4, 5. *See United States v. Gilmore*, 776 F.3d 765, 769 (10th Cir. 2015) (recognizing that the community caretaking exception to the warrant requirement permits officers to seize individuals and take other steps when necessary to protect the safety of the public or the seized individual).

Mr. Roulet argues that, although the officers' actions were initially permitted under the community-caretaking exception, any concerns they had regarding Mr. Roulet's safety had "dissipated within 45 seconds" of their encounter with Mr. Roulet and that Mr. Roulet should have been free to leave once it became clear that he was not in need of assistance. Dkt. 22 at 5. The evidence does not support this argument. The Court has reviewed the video of Mr. Roulet's encounter with the officers. When responding to the officers, Mr. Roulet appeared disoriented and confused. He vacillated between responding to police in a loud, incredulous manner and a quiet, meek one. He had difficulty navigating a concrete curb and appeared to put his arms out for balance while doing so. When police directed him to the parking strip, he leaned back against a tree and slid down. He was sweating despite the freezing temperature. And he appeared to forget that he had placed a torch lighter on top of the car a few seconds before the police asked whether he had been using fentanyl. *See* Dkt. 23-1; Dkt. 23-2. In other words, he objectively appeared to be under the influence of drugs.

Contrary to Mr. Roulet's suggestion, the evidence did not require the officers to conclude that "Mr. Roulet was not intoxicated and did not need assistance" and end their welfare check after forty-five seconds. Dkt. 22 at 5-6. Instead, the evidence demonstrates that the officers had a reasonable basis to suspect that Mr. Roulet was intoxicated and alone in a cold parking lot with

keys to a nearby vehicle. Under those circumstances, the officers were permitted to continue their discussion with Mr. Roulet to determine the nature and extent of his intoxication, whether he presented a safety risk to himself or others, and whether and how to get Mr. Roulet to a location where he would be safe from the freezing weather. *See United States v. Garner*, 416 F.3d 1208, 1216 (10th Cir. 2005) (holding that it was reasonable for officers to continue detaining an individual where there was reason to believe he was intoxicated and the officers' questions were reasonably related to that belief); *see also Gilmore*, 776 F.3d at 772 (concluding that the officers were permitted to take an apparently intoxicated individual into protective custody based upon, among other things, the risk that he could suffer injury or death if he could not find shelter from the cold). The Constitution did not require the officers to walk away after forty-five seconds and leave an apparently intoxicated individual alone in the cold with access to a vehicle.[7]

Of course, the fact that the officers had reason to continue their discussion with Mr. Roulet for more than a brief period does not mean that the officers had reason to search his car. That is a distinct question that requires a distinct evidentiary showing. The Fourth Amendment ordinarily prohibits warrantless searches of automobiles. *See Katz v. United States*, 389 U.S. 347, 357 (1967). Because no warrant was obtained in this case, the Government bears the burden of establishing that the search was justified by an exception to the warrant requirement. *Id.* The Government argues that the search was

---

[7] Although it is not material to the suppression issue, the Court concludes that the community-caretaking exception permitted the officers to continue their discussion with Mr. Roulet at least until he passed out (or appeared to do so), when the need for continued intervention became even more apparent. *See* Dkt. 23-2 at 2:05-2:45. At the hearing, Mr. Roulet's counsel suggested that Mr. Roulet did not pass out in the video but was avoiding a question or doing some other intentional act. There is no evidence the officers were aware of that alternative rationale for his behavior. Even if they were, that would not change the outcome. *E.g., Munday v. Johnson*, 257 F. App'x 126, 134 (10th Cir. 2007) (recognizing that officers are not "required to forego making an arrest based on facts supporting probable cause simply because the arrestee offers a different explanation").

No. 26-cv-055

authorized by both the automobile exception and the community-caretaker exception to the warrant requirement. Dkt. 31 at 9.

The Court concludes that the automobile exception to the warrant requirement applies here. The automobile exception is premised upon both the "inherent mobility of cars" and "the fact that there is a reduced expectation of privacy with motor vehicles." *United States v. Mercado*, 307 F.3d 1226, 1228 (10th Cir. 2002). Under that exception, officers who "have probable cause to believe that an automobile contains contraband" need not "obtain a warrant prior to searching the car for and seizing the contraband." *Florida v. White*, 526 U.S. 559, 563–64 (1999). Thus, so long as the officers had probable cause to believe that Mr. Roulet's car contained contraband or other evidence subject to seizure, their decision to search the car was constitutionally permissible. *See Mercado*, 307 F.3d at 1230 (quoting *United States v. Ludwig*, 10 F.3d 1523, 1528 (10th Cir. 1993)).

The Court finds that the officers had probable cause to search Mr. Roulet's car. "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *United States v. Bullcoming*, 764 F. App'x 804, 807 (10th Cir. 2019) (quoting *United States v. Downs*, 151 F.3d 1301, 1303 (10th Cir. 1998)). The Tenth Circuit has recognized that "the odor of marijuana alone can satisfy the probable cause requirement to search a vehicle or baggage." *United States v. Morin*, 949 F.2d 297, 300 (10th Cir. 1991); *see also Downs*, 151 F. 3d at 1303 (recognizing that the "smell of burnt marijuana is generally consistent with personal use of marijuana in the passenger compartment of an automobile"); *Bullcoming*, 764 F. App'x at 807. "This remains the case even though [medical use of] marijuana is legal in [Oklahoma] because [recreational] possession remains illegal under federal law,"[8] because Oklahoma circumscribes the use of marijuana in general, and because Oklahoma

---

[8] Marijuana was reclassified from Schedule I to Schedule III in April 2026.

No. 26-cv-055

criminalizes the control of motor vehicles by intoxicated individuals. *United States v. Gonsalez*, No. 24-cr-01819-KWR, 2025 WL 2476523, at *6 (D.N.M. Aug. 28, 2025) (finding officers had probable cause to search car based on smell of burnt marijuana despite the fact that recreational marijuana use is legal in New Mexico).[9]

Here, the Government introduced evidence that the officers detected the smell of marijuana when they opened the car door, and the Court has credited that evidence over Mr. Roulet's objections. That evidence alone established probable cause to search the vehicle. *See id.* But the officers had more than the smell of marijuana to support their search. They knew, based on the call for a welfare check that they had received, that Mr. Roulet appeared to be asleep in his car on a cold evening, and that an employee of a nearby store was unable to wake him by knocking on the window. When the officers arrived to check on Mr. Roulet, he was still in that same condition. He also had a torch lighter—which Officer Johnson testified is often used to smoke fentanyl—in his lap.[10] When Mr. Roulet exited the vehicle, he was sweating and unstable on his feet. Based on this evidence, the officers

---

[9] *See State v. Roberson*, 2021 OK CR 16, ¶ 13, 492 P.3d 620, 623 (holding that [t]he decriminalization of marijuana possession for those holding medical marijuana licenses [in Oklahoma] in no way affects a police officer's formation of probable cause based upon the presence or odor of marijuana," and concluding that the officer had probable cause to search a vehicle based on marijuana in the vehicle's ash tray and the occupant's disclosure of marijuana use); *see also* Okla. Stat. tit. 47, § 11-902 (effective November 1, 2025) (criminalizing the act of driving, operating, or being "in actual physical control of a motor vehicle" by those with detectable amounts of Schedule I substances in any bodily fluid or those under the influence of an intoxicating substance, regardless of whether that person may be "lawfully entitled to use . . . [the] controlled dangerous substance or . . . intoxicating substance").

[10] Officer Johnson also testified that he saw two metal pipes in the console of the car that he believed were used to smoke fentanyl. These pipes are referenced in his report, but not in the video footage. Although the Court considers Officer Johnson's testimony to be credible, it does not consider the pipes due to the lack of evidence corroborating Officer Johnson's claim that he saw the pipes before discovering the challenged firearm.

No. 26-cv-055

reasonably concluded that Mr. Roulet was under the influence of an illegal substance while behind the wheel of a running vehicle. They were therefore justified in searching the interior of the vehicle for contraband and other evidence subject to seizure. *Mercado*, 307 F.3d at 1230.

## III

The Government argues that the search was further justified because bullets were plainly visible in the center console of the car, giving the officers probable cause to believe that Mr. Roulet had possessed ammunition in violation of federal law. *See* 18 U.S.C. § 922(g)(3) (prohibiting those who unlawfully use or are addicted to controlled substances from receiving, possessing, or transporting ammunition in or affecting interstate commerce). It is clear that the bullets were plainly visible from outside the vehicle (as evidenced by video of another officer viewing and remarking on them from the passenger side). Dkt. 23-1 at 1:25-2:00. Less clear, however, is whether Officer Johnson saw the bullets before his hand and forearm entered the vehicle.[11]

While there is no legitimate expectation of privacy shielding those portions of an automobile that "may be viewed from outside the vehicle by either inquisitive passerby or diligent police officers," *Texas v. Brown*, 460 U.S. 730, 740 (1983), the physical occupation of "private property for the purpose of obtaining information" is prohibited. *United States v. Jones*, 565 U.S. 400, 404-05 (2012). Although this set of facts presents an interesting academic question of whether inserting a light into an open door precludes consideration of what could be seen—or was later seen—without the intrusion, the Court need not reach that question today. The officers had probable cause to search the car with or without knowledge of the ammunition present within it, and there is no need to determine whether Officer Johnson's physical

---

[11] Officer Johnson testified that he saw the bullets in plain view, but he does not testify that he saw them before breaching the passenger compartment. It is clear from the video that other officers saw the bullets from outside the vehicle and remarked on them before the firearm was located. *See* Dkt. 23-1 at 1:25-2:00.

No. 26-cv-055

intrusion affected his ability to consider the bullets sitting in plain view from the car's exterior.

IV

The Court finds that the officers had probable cause to search Mr. Roulet's vehicle upon opening the door and smelling marijuana, and that the search was further justified by Mr. Roulet's words and actions in the brief interval that followed. Accordingly, the search was permissible under the automobile exception to the warrant requirement. Mr. Roulet's motion to suppress the fruit of that search [Dkt. 22] is denied.

DATED this 15th day of May 2026.

JOHN D. RUSSELL
*United States District Judge*